UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LARRY JONES, | ) |
| Plaintiff, | ) |
| | ) No. 13 C 5074 |
| v. | ) |
| | ) Judge Joan H. Lefkow |
| UNITED CONVEYOR SUPPLY COMPANY, | ) |
| Defendant. | ) |

**OPINION AND ORDER**

On July 17, 2013, Larry Jones filed a complaint against his former employer, United Conveyor Supply Company, alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. (Dkt. 1) Before the court is defendant's motion for summary judgment. (Dkt. 44.) For the reasons stated below, defendant's motion is granted in part and denied in part.[1]

---

[1] This court's jurisdiction rests on 28 U.S.C. § 1331 (federal question), 42 U.S.C. § 2000e-5(f)(3) (Title VII), and 42 U.S.C. § 1343 (civil rights). Venue is appropriate in this district under 28 U.S.C. § 1391(b).

# BACKGROUND[2]

## I. The Parties

United Conveyor Supply Company ("UCSC") manufactures ash-handling equipment that it sells to coal-fired power plants. (Dkt. 46 ("Def. L.R. 56.1") ¶ 9.) Most of the steel work necessary to manufacture this equipment is done at UCSC's plant in Melrose Park. (*Id.*)

The plant employs three "grades" of laborers: Grade A, Grade B, and Grade C. (Dkt. 55 ("Pl. L. R. 56.1") ¶ 6.) Grade A laborers do the most advanced work and Grade C laborers do the least. (*See id.* ¶¶ 6–7.) In late 2007, David Riguzzi, the manager at the Melrose Park plant, hired Jones as a Grade C welder. (Def. L.R. 56.1 ¶¶ 25–26.) Jones is an African-American man. (*Id.* ¶ 2.)

## II. Collective Bargaining Agreement

From March 2010 to March 2014, the laborers at the Melrose Park plant were represented by a union. (*Id.* ¶ 12.) Their collective bargaining agreement expressly addressed promotions and layoffs, both of which are at issue in this case. (*Id.* ¶ 13.) It provided:

> Seniority and the qualifications to perform the work shall be the guiding principle [*sic*] in determining the distribution of work during slack periods, layoffs, recalls, promotions, and demotions. When two or more bargaining unit employees have the qualifications to perform the work, seniority shall be the deciding factor. Any such determinations described above shall rest solely with the Company.

---

[2] The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). In accordance with its regular practice, the court has considered the parties' objections to statements of fact and included in this background only those parts of the statements and responses that are appropriately supported and relevant to the resolution of this motion.

(Dkt. 47-11 at 5.) It also required UCSC to post notice of any internal job openings for three weekdays; if bargaining unit employees did not bid on an open position or were not qualified for the position, the company reserved the right to hire a new employee. (*Id.* at 12–13.)

## III.     Request for Promotion

Grade B fitter welders, as their name implies, do both welding and fitting. Grade C welders do only welding. (Def. L.R. 56.1 ¶¶ 29–31.) Thus, fitter welders have a broader, more advanced skill set. Because fitting requires the assembly of different components, fitter welders must be able to read blueprints and must have sufficient knowledge of math and geometry to perform any necessary calculations. *(Id.* ¶ 31.) As Grade B laborers, fitter welders earn more than welders. (*See* Pl. L.R. 56.1 ¶ 7.)

During the four-and-a-half years Jones worked at UCSC, management posted sign-up sheets for open fitter welder positions seven different times. (Def. L.R. 56.1 ¶ 41.) Jones only applied once, on March 10, 2010. (*Id.* ¶ 44.) UCSC, however, did not consider his application because he was on probation, having received two violations for not completing his work on time. (*Id.* ¶¶ 40, 45.) Jones did not apply again.

## IV.     May 2010 Meeting

On May 5, Mackle Franklin, an African-American employee at the Melrose Park plant, approached Riguzzi to voice his concern that African-American employees were not given the same opportunities as other employees. (*Id.* ¶ 47.) Riguzzi offered to meet with Franklin and other African-American employees. (*Id.*) Riguzzi first notified the union, however, which directed all African-American employees to attend. (*Id.* ¶ 48.) Riguzzi held the meeting the next day, May 6, 2010. (*Id.* ¶ 49.) Six out of the company's seven African-American employees attended. (*See id.* ¶¶ 49, 53.) Although Franklin, who was the first to voice his concerns, did

"most of the talking," Jones also spoke up. (*Id.* ¶¶ 50–51.) According to Riguzzi, Jones said that although he signed up for the fitter welder position he was never given the opportunity to test for it. (*Id.* ¶ 51.) Riguzzi testified that, in response, he told Jones that he was not eligible for the promotion because he had been on probation at the time. (*Id.*) Jones claims that he also made broader statements to Riguzzi, including that the company had unfairly targeted him in issuing work rule violations and that he thought African-American employees were not treated as well as other employees. (Dkt. 56 ("Pl. L.R. 56.1 Resp.") ¶ 52); (Dkt. 47-2 at 83:19–84:9, 85:2–11.)

## V.     Layoffs

In 2012, UCSC began to struggle financially. (Def. L.R. 56.1 ¶ 64.) At the time, Riguzzi estimated the plant only had enough work for a little over forty percent of its laborers. (*Id.* ¶ 68.) He recommended laying off five Grade C laborers, including the company's three Grade C welders. (*Id.*) On March 30, 2012, UCSC laid off the employees, all of whom were African-American. (*Id.* ¶ 71.) The company laid off a Caucasian plant superintendent two months later. (*Id.* ¶¶ 68, 71.)

Soon after, the union filed a grievance on behalf of the five Grade C employees, alleging that the company should have laid off less-senior Grade B employees rather than the five more-senior Grade C employees. (*Id.* ¶ 72.) UCSC responded that it had acted according to the collective bargaining agreement because it considered both seniority and qualifications. (*Id.*); (Dkt. 47-11 at 8 ("Seniority *and the qualifications to perform the work* shall be the guiding principle in determining the distribution of work during slack periods, layoffs, recalls, promotions, and demotions.") (emphasis added).) The union did not pursue the grievance. (Def. L.R. 56.1 ¶ 72.)

4

Around the same time, one of the Grade C laborers, David Karim, filed a charge of race discrimination with the Illinois Department of Human Rights (IDHR) and the Equal Employment Opportunity Commission (EEOC). (*Id.* ¶ 73.)

## VI. Recall

In September 2012, UCSC had enough work to support one Grade C welder; it called back McKinley Hooper, the most senior of the Grade C welders who had been laid off. (*Id.* ¶ 74.) UCSC also had an opening for two fitter welders. (*Id.* ¶ 75.) Riguzzi posted the positions but no one bid for them, so he hired outside candidates. (*Id.*)

In August, 2013, the company called back another employee, Johnnie Robinson, to work as a full-time painter. (*Id.* ¶ 77.) In December of 2013, Riguzzi recalled Karim, the same employee who had filed a charge with the IDHR and the EEOC, to return to work as a burn table operator. (*Id.* ¶ 78.) Karim declined the position. (*Id.* ¶ 78.) In total, the company called back three of the five employees laid off in March 2012. UCSC maintains the recalls were made in accordance with the collective bargaining agreement, which permitted the company to consider both seniority and qualifications in deciding which employees to call back. (*See* dkt. 47-11 at 5.)

## VII. Procedural History

On June 1, 2012, Jones filed a charge of race discrimination and retaliation with the IDHR and the EEOC. (Def. L.R. 56.1 ¶ 6.) Jones alleged that he was laid off because he is African-American and in retaliation for his statements at the May 2010 meeting. (*Id.*) On December 19, 2012, he amended his charge to allege that he was not recalled because of his race. (*Id.* ¶ 7.) The EEOC issued Jones a right-to-sue letter. (*Id.*)

Jones filed a *pro se* complaint in this court on July 17, 2013, which he amended in January and February of the following year. (Dkts. 1, 24, 29.) His current complaint alleges that

UCSC failed to train and promote him and then laid him off and did not recall him—all in violation of Title VII. (Dkt. 29 ("Sec. Am. Compl.").) It also alleges that the layoff and failure to recall were acts of retaliation, also in violation of Title VII. (*Id.*) Finally, the complaint states a claim of discrimination and retaliation in violation of § 1981. (*Id.*)

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether a genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324. If a claim or defense is devoid of any factual support, the court may dispose of it. *Id.* at 323–24.

Summary judgment "does not denigrate the role of the jury." *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . [Thus, the] evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*; *see also Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

## ANALYSIS

The standards governing discrimination and retaliation claims under Title VII and Section 1981 are identical, except that Title VII requires exhaustion of administrative remedies. *See Humphries* v. *CBOCS West, Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007) (citations omitted). USCS contends that some of Jones's claims must be dismissed as untimely under the exhaustion requirement.

**I.      Title VII**

    **A.      Discrimination**

        **1.      Training and Promotion**

A plaintiff filing a charge in Illinois must file with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). *Groesch* v. *City of Springfield*, 635 F.3d 1020, 1024 n.2 (7th Cir. 2011) (citations omitted).

Jones filed his original charge on June 1, 2012 and an amended charge on December 19, 2012. (Def. L.R. 56.1 ¶ 6.) He applied for a promotion March 10, 2010. (*Id.* ¶ 44.) He later objected to UCSC's failure to consider his application at a May 6, 2010 meeting. (*Id.* ¶ 51.) Even taking the later date as the accrual date, Jones filed the charge with the EEOC well after the 300-day deadline. Thus, Jones's Title VII claim, to the extent it is based on an alleged failure to train and promote, is time-barred. The court, however, may still consider these allegations in support of his § 1981 claim.

## 2. Layoff

Title VII makes it illegal "for an employer to fail or refuse to hire or to discharge any individual" on the basis of race. 42 U.S.C. § 2000e-2(a). To survive summary judgment on a claim of discrimination, a plaintiff may proceed under the direct method or the indirect method of proof.[3] *Winsley* v. *Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009). Jones proceeds under the direct method. (*See* dkt. 54 at 8.)

Under the direct method, the plaintiff must produce either direct or circumstantial evidence of discriminatory intent. *Brown* v. *Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012) (citation omitted). Jones presents circumstantial evidence. To prevail with this type of evidence, Jones must "construct a convincing mosaic" that "allows a jury to infer intentional discrimination by the decisionmaker." *Brown*, 700 F.3d at 1105 (citation omitted) (internal quotation marks omitted). Generally, the pieces of that "mosaic" fall into three categories. *Perez* v. *Thorntons, Inc.*, 731 F.3d 699, 711 (7th Cir. 2013). The first includes "suspicious timing, ambiguous statements oral or written, and other bits and pieces" from which a jury could infer discrimination. *Cloe* v. *City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013) (citation omitted) (internal quotation mark omitted). The second is "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently." *Id.* And the third is "evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* A plaintiff need not produce evidence in each category to

---

[3] Although the Seventh Circuit has recently questioned the continued usefulness of this test, it has not yet abandoned it. *See, e.g.*, *Perez* v. *Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013) (recognizing and joining "the majority of active judges in this circuit who have opined that the time has come to jettison the 'ossified direct/indirect paradigm' in favor of a simple analysis of whether a reasonable jury could infer prohibited discrimination" but still applying the direct/indirect paradigm).

survive summary judgment. *Diaz* v. *Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011) (citation omitted).

Jones points to the fact that UCSC laid off five workers, all African-American. (Jones omits the Caucasian superintendent who was laid off two months later[4]). (Dkt. 54 at 9.) He contends that this action, in conjunction with evidence that similarly situated employees who were not African-American were treated more favorably and evidence that UCSC's reason for the layoff was pretextual, provide sufficient support for his claim.[5]

In determining whether two employees are similarly situated, a court must look at all relevant factors, including whether the employees "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Ajayi* v. *Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003). "[C]omparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories." *Senske* v. *Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) (citation omitted); *see also Crawford* v. *Indiana Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (the question is whether "members of the comparison group are sufficiently comparable to [the plaintiff] to suggest that [the plaintiff] was singled out for worse treatment" (citation omitted)).

---

[4] This is appropriate since a superintendent would not be a comparable employee.

[5] As a preliminary matter, defendant argues that because Riguzzi both hired and laid off Jones, "a presumption of nondiscrimination arises." (Dkt. 45 at 10.) Although the Seventh Circuit has at times applied this "common actor presumption" without question, *see Chiaramonte* v. *Fashion Bed Grp., Inc., a Div. of Leggett & Platt, Inc.*, 129 F.3d 391, 399 (7th Cir. 1997), it has also warned that treating it as a true presumption (as opposed to a reason to be skeptical of a plaintiff's claims) is a mistake. *See Herrnreiter* v. *Chicago Hous. Auth.*, 315 F.3d 742, 747 (7th Cir. 2002) ("It is misleading to suggest (as some cases do), that this skepticism creates a 'presumption' of nondiscrimination, as that would imply that the employee must meet it or lose his case. It is just something for the trier of fact to consider." (internal citations omitted)).

Jones argues that laying off five African-Americans while sparing "non-African-American employees of the same grade and fitter welders" shows disparate treatment. (Dkt. 54 at 11.) The non-African-American employees of the same grade are Ed Klein (a machine operator), Francisco Caceres (a machine operator), and Louis Robles (a painter). (Pl. L.R. 56.1 ¶ 22.) Klein, Caceres, and Robles did not hold the same job description or have comparable skills or experience. (*See* Def. L.R. 56.1 ¶¶ 21–22 (describing Jones's education and experience welding).) Although they may have had the same supervisor, and were likely subject to at least some of the same general standards, the differences in their treatment can easily be attributed to the differences in the work they performed.

Perhaps aware of this, Jones devotes the majority of his argument to the fitter welders. (Dkt. 54 at 9–11.) Jones contends that the fact that he and several other African-American welders were laid off instead of less senior fitter welders of a different race, is evidence of race discrimination. Jones acknowledges this numerous times in his response to USCS's statement of material facts and in his own statement of material facts that welders and fitter welders are different positions that require different skill sets. (*See, e.g.*, Pl. L.R. 56.1 Resp. ¶¶ 29–32 (not disputing that welders and fitter welders "are two different positions," that fitter welders can perform tasks that welders cannot, and that fitter welders require "more training"); (*see also* Pl. L.R. 56.1 ¶ 9 (stating that the fitter welder position requires more training and more "sophisticated skills").) Thus, Jones has not shown that similarly situated employees of other races received more favorable treatment.

There is, however, overlap between the two positions, and Jones also argues that UCSC's reason for the layoffs—that there was not enough work for the welders—was pretextual. The focus of this inquiry is whether the proffered reason for taking the action at issue is a lie.

10

*Vaughn* v. *Vilsack*, 715 F.3d 1001, 1008 (7th Cir. 2013) (citing *O'Leary* v. *Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). Jones argues that UCSC's reason must be pretextual because the proffered reason makes no sense. Jones notes that fitter welders are paid more than welders. Thus, he reasons, if there really was a shortage of work, and the company needed to save money, it would have laid off fitter welders instead. (Dkt. 54 at 11–12.) USCS counters that fitter welders do both welding and fitting—in other words, they do exactly what welders do *and more*. Thus, USCS argues, it makes perfect sense for a company that did not have enough welding work to lay off the employees who could do only welding work and retain the employees who could do both welding and fitting work. (Dkt. 57 at 9.) Further, USCS argues that Jones's repeated assertion that the fitter welders should have been laid off because they were under-utilized—they spent at least half of their time welding—actually undermines Jones's claim. (Dkt. 57 at 9–10.) It explains that because fitter welders could and did do welding work, there was no need for UCSC to keep the welders on its workforce when it experienced a decrease in demand.

Although USCS's interpretation of the evidence is certainly reasonable, there is some evidence that the employer offered a pretextual reason for an adverse employment action. It is undisputed that UCSC could have laid off less senior grade B employees instead of more senior Grade C employees, but it laid off only African-Americans. USCS might have divided the reduced labor force by task, i.e., by assigning fitter welders to fitting and welders to welding. That only African-Americans lost their jobs when alternatives were present is sufficient to permit an inference that non-African-American employees were favored. Making every justifiable inference in Jones's favor, as one must on a motion for summary judgment, the court finds a

genuine dispute of material fact as to whether UCSC's proffered reason for the layoff was mere pretext. *See Anderson*, 477 U.S. at 255.

### 3. Recall

Jones argues that "[t]his same evidence," as well as UCSC's hiring of two fitter welders of other races five months after the layoffs, supports his claim that the company discriminated against him by failing to recall him. (Dkt. 54 at 11.) Because Jones is arguing that he was laid off on the basis of his race, and then not recalled for the same reason, the court agrees. It notes, however, that Jones has again failed to show that similarly situated employees were treated more favorably. Indeed, UCSC actually recalled two African-American employees—one of whom held the same position as Jones. In September of 2012, it called back McKinley Hooper, an African-American and the most senior of the Grade C welders. (Def. L.R. 56.1 ¶ 74.) In December of that year, UCSC also called back Karim (who had previously filed a charge with the IDHR and the EEOC), to return to work as a burn table operator. (*Id.* ¶ 78.) Jones does not dispute either recall. (Pl. L.R. 56.1 Resp. ¶¶ 74, 78.) But contrary to what USCS seems to suggest, these recalls do not put an end to Jones's claim. There is still a genuine dispute of material fact as whether UCSC's reason in laying off Jones, and in failing to recall him, was racially motivated.

### B. Retaliation

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *Brown* v. *Ill. Dep't of Natural Res.*, 499 F.3d 675, 684 (7th Cir. 2007). "A plaintiff may prove retaliation by using either the direct

method or the indirect, burden-shifting method." *Tomanovich* v. *City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006) (citation omitted) (internal quotation marks omitted). Again, Jones proceeds under the direct methods. Under the direct method, a plaintiff must establish with direct or circumstantial evidence (1) that he engaged in protected conduct, (2) that he was subjected to an adverse employment action, and (3) that there was a causal link between the protected activity and the employment action. *Hobgood* v. *Ill. Gaming Bd.*, 731 F.3d 635, 642 (7th Cir. 2013) (citation omitted).

Jones argues that the March 2012 layoffs were in retaliation for the May 2010 meeting, where Jones and other employees voiced their frustration with the company's treatment of African-Americans. (Dkt. 54 at 13.) The parties do not dispute the first two elements. Thus, the only question is whether Jones has offered evidence in support of his assertion that there is a causal link between the protected activity and the employment action. This evidence must suggest the protected conduct was a "substantial or motivating factor." *See Leitgen* v. *Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011). Jones notes that four out of the five employees who were laid off participated in the meeting. (Dkt. 54 at 13.) He then recites the same arguments discussed above (that the company's reason for laying off the welders was pretext because fitter welders were paid more than welders and because fitter welders were "under-utilized") in support of his claim. (*Id.*)

Jones also offers additional support. In his response to USCS's motion, Jones describes an email Riguzzi sent UCSC's directors of supply chain and of human resources shortly after the May 2010 meeting. (*Id*. at 4.) In the email, Riguzzi explained that employees had approached him about a race issue at the plant. (*Id.*) Although parts of the email suggest Riguzzi is sympathetic to their concerns, other parts appear to express frustration:

13

> There has been a discussed [*sic*] about this issue with them and it comes down to an issue of individuals who believe they are ready for more challenging work and believe they are not put to the challenge or have the opportunity to perform more difficult work. I am not proud or want to down play the fact that these employees have vocalized their viewpoint of racial discrimination.
>
> \*\*\*
>
> We recognize talent and effort put forth by an employee and use these attributes a [sic] measurement of progress for our employees. We want our employees to have the outlook of *"what can do"* [*sic*] *not "what can you do for me."*
>
> \*\*\*
>
> A group of employees say I cannot progress if I don't get the opportunity to perform the more challenging tasks. *Recognize my need vs. recognize my achievements*.

(Dkt. 55-19 at 1 (emphasis added).) Whether this ambiguous email (in conjunction with the fact that four out of the five employees who were laid off attended the May 2010 meeting Riguzzi references as well as the evidence discussed above) suggests the employees were retaliated against is a question for a jury.

Jones acknowledges the significant time gap between the meeting and the layoff but argues that 2012 may have been the first opportunity Riguzzi had to retaliate against him and the other employees. As Jones explains, under the collective bargaining agreement, the company could only discharge an employee "for cause" or "because of lack of work or any other legitimate reason." (Dkt. 54 at 14); (Dkt. 47-11 at 4.)

Although UCSC claims too much time elapsed between the 2010 meeting and the 2012 layoffs for there to be a causal connection between the two, the Seventh Circuit has "consistently and repeatedly" instructed that "a long time interval between protected activity and adverse employment action may weaken but does not conclusively bar an inference of retaliation."

*Malin* v. *Hospira, Inc.*, 762 F.3d 552, 560 (7th Cir. 2014), *reh'g denied* (Sept. 16, 2014). Here, Riguzzi's reaction "permits an inference" that "he had a long memory." *Id.* USCS argues that *Malin* is distinguishable, as there the plaintiff was "repeatedly retaliated against" in the intervening time period and Jones claims no other acts of retaliation. The court does not read *Malin* so narrowly. *Malin*'s conclusion did not depend on the presence of those repeated instances. Instead, the court was clear that a long time interval does not conclusively bar an inference of retaliation. The same holds true for Jones's allegation that UCSC retaliated against him by failing to recall him. Although the fact that the company recalled other African-American employees weakens Jones's claim, it does not, as USCS argues, "eviscerate[]" it. (*See* dkt 45 at 15.) Jones's retaliation claim is sufficiently supported to withstand summary judgment.

## II.     Section 1981

Jones also alleges racial discrimination and retaliation in violation of § 1981. (Sec. Am. Compl.) As noted above, the standard of proof governing discrimination and retaliation claims under Title VII and Section 1981 are identical. *See Humphries*, 474 F.3d at 403–04. Thus, Jones's discrimination and retaliation claim under § 1981 survive to the same extent as his claims under Title VII. The court will also consider whether his discrimination claim can be further supported by his allegations that UCSC failed to train and promote him. This leaves his failure to train and to promote claims, which are untimely under Title VII.

In a failure-to-train claim the plaintiff must demonstrate (1) that he belongs to a protected class, (2) that his employer provided training to its employees, (3) that he was eligible for training, and (4) that he was not provided training under circumstances giving rise to an inference of discrimination. *Malacara* v. *City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000) (citing *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998)). In order to establish a prima facie

15

case of race discrimination for failure to promote, Jones must show (1) that he belongs to a racial minority, (2) that he applied and was qualified for a job for which the employer was seeking applicants, (3) that, despite his qualifications, he was rejected, and (4) the position was given to someone of a different race who had similar or lesser qualifications. *Id.* (citing *Perdomo* v. *Browner*, 67 F.3d 140, 144 (7th Cir. 1995)). The court considers Jones's failure-to-train claim first.

Although USCS agrees that Jones is a member of a protected group and that UCSC provided training to its employees, it argues that Jones's claim fails because he was not eligible for training. (Dkt. 57 at 6–7.) UCSC imposed training eligibility requirements, including that the employee "not be on probation for violation of any Work or Safety Rule." (Dkt. 47-25 at 3.) Jones was issued Work Rule violations for failing to perform his work in a timely manner on December 23, 2009 and on February 11, 2010—a month before he signed up for the fitter welder position. (Def. L.R. 56.1 ¶ 40.) USCS contends that Jones's failure-to-promote claim suffers from the same defect, as Jones cannot show that he was qualified for the fitter welder position. When promoting from within, UCSC did not require employees to have the skill set necessary; instead, it agreed to train them. Jones, however, was not eligible for that training. (*Id.* ¶ 18 (describing the company's policy requiring employees to "request training, meet eligibility requirements, and complete training on their own time).)

But USCS overlooks a critical point: Jones maintains that the violations themselves were discriminatory. (Dkt. 47-2 at 83:19–84:9.) Indeed, at the May 2010 meeting Jones told Riguzzi he thought he was being unfairly targeted because of his race. (*Id.*) Jones did not sign any of the notices as a form of protest. (Dkt. 55-10 at 2–3.) Jones argues, therefore, that he was on probation *because* he is African-American. If true, this would mean that Jones was only

16

ineligible for training, and only unqualified for promotion, because of his race. And if Jones could show this, he would necessarily also show that he was not provided training under circumstances giving rise to an inference of discrimination. Thus, the fact that Jones was on probation does not extinguish his claim.

Jones further supports his claim with testimony that the company gave harder tests to African-American employees than it gave to other employees. (Dkt. 47-2 at 79:19–81:1, 128:22–129:1.) He also testifies that UCSC did not always follow its policy that employees were responsible for completing training on their own time, and sometimes provided other employees on-the-job training that it denied to African-American employees. (*See id.* at 85:2–11.) This typically happened, Jones testified, after the company hired less qualified employees of other races. (*Id.* at 129:11–22, 140:21–141:11.)

This is sufficient to withstand summary judgment. Jones has offered evidence creating a genuine dispute of material fact as to whether he was denied training and a promotion on the basis of his race. Thus, Jones can support his claim of discrimination under § 1981 with his allegations that he was denied training and advancement.

## CONCLUSION

For the reasons stated above, defendant's motion is granted in part and denied in part. Jones's discrimination claim under Title VII can proceed to trial to the extent it is based on his allegations that he was laid off and then not recalled because of his race. Plaintiff's discrimination claim under § 1981 can also proceed to trial based on those allegations as well as

his allegation that he was denied training and advancement. Jones's retaliation claims under both Title VII and § 1981 are also appropriate for trial.

This case will be called for a status hearing on September 29, 2015 at 11:00 a.m.

ENTER:

Date: September 8, 2015

_____
U.S. District Judge Joan H. Lefkow